## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**01/12/2012**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 10-30550** |
| KIRK FRANCESCHINI | § | **CHAPTER  7** |
| | § | |
| Debtor(s). | § | **JUDGE ISGUR** |
| | § | |
| | § | |
| FORD MOTOR CREDIT CO.,  LLC | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | **ADVERSARY NO. 10-3175** |
| | § | |
| KIRK FRANCESCHINI | § | |
| | § | |
| Defendant(s). | § | |

## MEMORANDUM OPINION

This is an adversary proceeding to determine the dischargeability of Kirk Franceschini's debt to Ford Motor Credit Co., LLC ("Ford Credit").  Ford Credit seeks an exception to discharge under 11 U.S.C. § 523(a)(6) for willful and malicious injury.

Franceschini was an owner of Paramount Southwest Imports, LP ("PSI"), which owned and operated a Hyundai dealership and a Mazda dealership.  PSI borrowed money from Ford Credit for working capital and to finance its wholesale purchases of vehicles.  The debt for the wholesale purchases was secured by a first-priority lien on all of the dealerships' vehicles,  parts, accounts, general intangibles, and various other assets.  When PSI went out of business in 2009, it failed to pay all the money it owed to Ford Credit.  After the sale of the dealerships, PSI still owed $917,367.92 to Ford Credit.  Pl's Ex. 74.  As the guarantor of the debt, Franceschini is personally liable for this amount.  The parties do not contest the amount of the debt.  ECF No. 109, at 12-13.

Ford Credit asserts that Franceschini's debt is nondischargeable because of willful and malicious injury. According to Ford Credit, Franceschini caused PSI to transfer over $1.6 million to family members, affiliates, other creditors, and vendors. Ford Credit alleges that it had a first-priority security interest in the transferred money. The transfers harmed Ford Credit's collateral position, ultimately resulting in the $917,367.92 deficiency. Ford Credit argues that the transfers were made willfully and maliciously—with objective certainty that Ford Credit would be harmed, and without just cause.

The Court finds that Franceschini acted willfully and maliciously in transferring Ford Credit's collateral. His debt to PSI is excepted from discharge.

## Jurisdiction

The District Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). This matter has been referred to the Bankruptcy Court by General Order 2005-12. This is a core proceeding under 28 U.S.C. § 157.

## Bankruptcy Court's Authority

Because bankruptcy judges are not Article III judges, they may not exercise the judicial power of the United States. *Stern v. Marshall*, 131 S.Ct. 2594, 2609 (2011) ("[T]he judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in [Article III]."). Bankruptcy judges therefore may not enter final judgments or orders in matters that fall within the exclusive authority of the Article III judiciary.

The Court may, however, exercise authority over essential bankruptcy matters under the public rights doctrine. Under *Thomas v. Union Carbide Agricultural Products Co.*, a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal. 473 U.S. 568, 593 (1985). The Bankruptcy Code is a public scheme for restructuring debtor-

creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Central Va. Cmty. College v. Katz*, 546 U.S. 356, 363-64 (2005); *see Northern Pipeline Constr. Co. v. Marathon Pipe Line co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'"). *But see Stern*, 131 S.Ct. at 2614 n.7 ("We noted [in *Granfinanciera, N.A. v. Nordberg*, 492 U.S. 33, 56 n.11 (1989) that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").

This case involves a dispute over whether Franceschini's debt to Ford Credit is dischargeable under § 523(a)(6) of the Bankruptcy Code. The right to a discharge is established by the Bankruptcy Code and is central to the public bankruptcy scheme. *See Katz*, 546 U.S. at 353 (including a discharge among the "[c]ritical features" of a bankruptcy proceeding). An individual debtor, upon surrendering all non-exempt assets for distribution in a chapter 7 case, is entitled to a discharge. *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) ("A bankruptcy court is able to provide the debtor a fresh start in this manner . . . because the court's jurisdiction is premised on the debtor and his estate, and not on the creditors."). Determinations of whether a debtor meets the conditions for a discharge are integral to the bankruptcy scheme, and bankruptcy courts have the authority to make such determinations pursuant to its *in rem* jurisdiction. *See id.* ("The discharge of a debt by a bankruptcy court is similarly an *in rem* proceeding.").

Similarly, bankruptcy courts have the authority to determine when the statutorily established right to a discharge does *not* apply. *Sanders v. Muhs (In re Muhs)*, 2011 WL

3421546, at *2 (Bankr. S.D. Tex. Aug. 2, 2011).  Unless a creditor proves the applicability of an exception to discharge, the creditor is entitled to collect only against the bankruptcy estate. *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 F. App'x 943, 945 (5th Cir. 2009) ("[T]he creditor claiming nondischargeability . . . has the burden of proving, by a preponderance of the evidence, that the debt is exempt from discharge.").  When a bankruptcy court determines the extent of a creditor's nondischargeable claim, the court simply decides that a particular creditor is entitled to something more than the creditor would otherwise get out of the bankruptcy bargain.  Such determinations are inextricably tied to the bankruptcy scheme and involve the adjudication of rights created by the Bankruptcy Code.  These determinations are also closely linked to the bankruptcy courts' *in rem* jurisdiction.

There is no dispute as to the amount of Franceschini's debt to Ford Credit; the issue is the portion of the debt that is nondischargeable.  This Court has constitutional authority to enter a final judgment in this adversary proceeding.

### Procedural Background

Franceschini filed a chapter 7 bankruptcy petition on January 22, 2010.  Ford Credit filed this adversary proceeding on April 19, 2010, seeking to have Franceschini's debt to Ford Credit declared nondischargeable under § 523(a)(4) for larceny, embezzlement, or defalcation in a fiduciary capacity or under § 523(a)(6) for willful and malicious injury.

On July 21, 2010, the Court dismissed Ford Credit's larceny and embezzlement claims. ECF No. 17.  The Court converted Franceschini's motion to dismiss on the defalcation claim to a motion for summary judgment.  The Court also gave Ford Credit 21 days to file an amended complaint that adequately pleaded a willful and malicious injury claim.

Ford Credit filed its First Amended Complaint, ECF No. 19, on August 11, 2010.  On the same day, Ford Credit filed a response to Franceschini's motion for summary judgment. Franceschini replied on August 25, 2010.

Franceschini filed a motion to dismiss the adversary proceeding on September 1, 2010. ECF No. 22.  Ford Credit responded to the motion to dismiss on September 22, 2010.  ECF No. 25.  On October 7, 2010, the Court granted Franceschini's motion for summary judgment with respect to the defalcation claim, finding that the agreements between PSI and Ford Credit did not establish an express trust that would create a fiduciary relationship.  ECF No. 33.  At a hearing on October 14, 2010, the Court denied Franceschini's motion to dismiss.

Ford Credit moved for partial summary judgment on the willful and malicious injury claim on February 18, 2011.  ECF No. 44.  Franceschini responded on February 23, 2011.  ECF No. 52.  Ford Credit filed a reply on March 17, 2011.  ECF No. 54.  The Court denied summary judgment on April 19, 2011, concluding that there were genuine disputes of material fact as to whether malice could be inferred from the circumstances of the alleged transfers and whether Franceschini had just cause for violating the floor plan agreements.  ECF No. 63, at 12.

The willful and malicious injury claim was tried on July 11-13, 2011, with closing arguments on August 18, 2011.  Kirk Franceschini testified.  Ford Credit's regional manager, Kurt Lauer, also testified, along with Ford Credit's expert witness, Scott Barnes.  The Court allowed the parties to file post-trial briefs.  Ford Credit filed two supplemental briefs on October 3, 2011.  ECF Nos. 103 & 104.  Franceschini filed a response on October 6, 2011.  ECF No. 105.

Ford Credit and Franceschini filed agreed-upon spreadsheets listing the relevant transfers. ECF No. 95.  The jointly filed spreadsheets include (i) a list of all the transfers between February 27, 2009 and March 6, 2009 that Ford Credit contends were willful and malicious, ECF No. 95-

2, and (ii) a spreadsheet showing cash distributions to vendors between February 27, 2009 and March 6, 2009, ECF No. 95-4.

Franceschini also moved to strike Ford Credit's supplemental brief at ECF No. 104, arguing that it was "not a brief and should be stricken because if it is a pleading, . . . [Ford Credit] was required to obtain leave of the Court to file such a tardy pleading." ECF No. 107, at 1-2. The Court now denies Franceschini's motion to strike the supplemental brief. The brief at ECF No. 104 contains arguments as to the correct interpretation of the facts presented at trial. It is a timely filed brief, not a tardy pleading.

**Findings of Fact**

PSI was a Texas limited partnership with dealerships selling Mazda and Hyundai automobiles. ECF No. 82, at 5. Ford Credit provided floor financing to PSI, extending a line of credit for PSI's wholesale purchases of vehicles. ECF No. 82, at 5. As PSI sold vehicles and collected the proceeds, PSI was obligated to pay Ford Credit the floored amount of the vehicles. ECF No. 109, at 41.

The floor financing arrangement between Ford Credit and PSI was established by an Automotive Wholesale Plan Application for Wholesale Financing and a Security Agreement ("Wholesale Agreement"), dated January 31, 2005. Pl's Ex. 1; ECF No. 82, at 5. In consideration for the financing, PSI granted to Ford Credit a security interest in all its vehicles, accessories, replacement parts, proceeds from the sale of merchandise or other collateral, accounts, instruments, chattel paper, general intangibles, contract rights documents and supporting obligations, and any rebates or refunds of the purchase prices of vehicles. Pl's Ex. 1, at 1; ECF No. 82, at 5. Ford Credit's security interest in the collateral was perfected by the filing of various UCC-1 Financing Statements. ECF No. 82, at 5; Pl's Ex. 6.

In addition, certain individuals, including Franceschini, each signed a Continuing Guaranty for these Dealerships for the full and complete payment of PSI's present and future obligations to Ford Credit.  ECF No. 82, at 5; Pl's Ex. 3.

Ford Credit additionally lent half of PSI's working capital to PSI—$1.5 million.  ECF No. 109, at 38.  Franceschini and Fernando Somoza put up the other $1.5 million.  ECF No. 109, at 38. Ford Credit's working capital loan to PSI is not at issue in this case.  ECF No. 110, at 73.

Franceschini was the registered agent and, together with Somoza, one of the owners of PSI.  ECF No. 110, at 9; Pl's Ex. 7, at 7; Pl's Ex. 45, at 1.  Franceschini was a limited partner of PSI and an officer of PSW, Inc., PSI's general partner.  Pl's Ex. 45, at 1.  The PSI dealerships were not Franceschini and Somoza's only dealerships.  Somoza and Franceschini owned the Paramount Auto Group, which included PSI's Mazda and Hyundai dealerships as well as Saturn, Infiniti, and Volkswagen dealerships.  Pl's Ex. 7, at 7; Pl's Ex. 45.

The $3.0 million in total working capital proved inadequate from the beginning.  PSI consistently failed to comply with the precise terms of the Wholesale Agreement.  Franceschini testified that "from day one, we had—always had delayed wholesale payoffs.  That was kind of part and parcel to the rest of our financing structure."  ECF No. 109, at 41.  He explained, "Ford pretty much allowed us to sell the cars, and then they come out once a month every couple of weeks, give us a list of cars, and those were the ones we'd pay off, and that was pretty much the practice and procedure."  ECF No. 109, at 43.  PSI was always eventually required to pay Ford. "[E]ventually, I understood . . . that obviously, eventually, we were going to have to pay Ford." ECF No. 109, at 96.  PSI often borrowed money on a short term basis from other Paramount dealerships to make the payments.  ECF No. 109, at 77.

Kurt Lauer, the regional manager for Ford Credit, testified that the pattern of dealings between Ford Credit and PSI was "[t]hat the dealer [was] not paying some of the payoffs until we arrive[d] at the dealership." ECF No. 110, at 197. "I think these wholesale payoffs are delayed—is it because he doesn't have the money? That's probably part of it. But whenever we showed up, he had the money. . . . So either he was just holding onto it or whatever the case was, but when we showed up to get paid, he was always willing to pay us and able to pay us. And because of the violations, we kept shrinking up the audit frequency." ECF No. 110, at 198.

The two lines of credit for the Mazda and Hyundai dealerships were established at approximately $5.6 million. At the end of 2008, PSI had around $12 million worth of inventory because Ford Credit allowed PSI to go over the line by almost one hundred percent. ECF No. 109, at 170. Ford Credit was aware that PSI had cash flow problems. ECF No. 110, at 139. The industry standard on sales out of trust—sales of cars without delivering proceeds to the floor plan lender—was 10 percent. ECF No. 110, at 139. PSI's numbers were consistently over 100%. Pl's Ex. 7, at 53 (bates KF003431); ECF No. 110, at 139. Ford Credit did not consider PSI to be actually out of trust, however, because PSI always eventually paid for the cars after audits. ECF No. 110, at 218-19.

PSI was additionally burdened by debt it incurred to build a new Mazda dealership building. ECF No. 109, at 79-80. PSI made the payments on the new building largely through transfers from the other Paramount dealerships.[1] ECF No. 109, at 135.

During a field credit review in July 2007, Ford Credit discovered that there had been inter-company transfers from Paramount Infiniti and Paramount Saturn to PSI. ECF No. 109, at 101-02. Pursuant to the Subordination and Pledge Agreements ("Subordination Agreements"),

---

[1] The Mazda dealership building was financed by Compass Bank. Compass Bank foreclosed in September 2009. ECF No. 109, at 192.

dated July 20, 2007, inter-company debts were subordinated to the debt of Ford Credit.  Pl's Ex. 27; Pl's Ex. 28; ECF No. 109, at 102-03.

Lauer testified that he did not have any indication that inter-company transfers continued to occur in violation of the Subordination Agreements.  ECF No. 109, at 236-37.  Franceschini said he believed Ford Credit understood that he made payments after audits by moving money from other dealerships, but he admitted that he never explained this to Ford Credit.  ECF No. 109, at 109.

In the fall of 2008, Ford Motor Company, facing its own economic difficulties, was in the process of reducing its interest in Mazda dealerships around the nation.  ECF No. 109, at 241.  Ford Credit began informing Mazda dealerships that they would need to locate alternate funding.  ECF No. 109, at 241.

Ford Credit sent a letter to PSI on October 1, 2008, requesting that PSI find alternative wholesale financing.  Pl's Ex. 12; ECF No. 109, at 157.  PSI eventually obtained some floor plan financing for used cars from MidSouth Bank.  ECF No. 109, at 163.  Although PSI was working with several lenders to obtain alternative floor plan financing for new cars, it was unsuccessful.  Ford Credit suspended PSI's credit line in January 2009.  Pl's Ex. 2, at 2.

Because of PSI's difficulty securing another floor plan lender, Franceschini asked Ford Credit to give him until the end of March to obtain alternative financing.  ECF No. 109, at 243-44.  PSI and Ford Credit entered into a Forbearance Agreement on January 21, 2009.  ECF No. 82, at 5.

Under the Forbearance Agreement, Pl's Ex. 2, PSI was required to deliver all proceeds of vehicles sales to Ford Credit upon receipt or within three business days, whichever occurred first.

After the Forbearance Agreement, Ford Credit began performing weekly audits of the dealerships.  ECF No. 109, at 244.

Also in January 2009, Nissan Motor Acceptance Corporation obtained a temporary injunction against the Paramount Infiniti dealership.  The agreed temporary injunction required Paramount Infiniti to "upon sale or lease of the vehicle, pay to NMAC, within two business days following receipt of the funds, the unpaid balance of the amount advanced by NMAC under the Agreement for the vehicle plus $2,000.00 per vehicle."  ECF No. 109, at 199-200.  Franceschini was aware that under this injunction, the Infiniti dealership was required to deliver proceeds to NMAC under that dealership's floor plan arrangement.  ECF No. 109, at 200.

At the same time, PSI continued its pattern of not promptly delivering proceeds to Ford Credit, its floor plan lender.  At the January 28, 2009 audit, PSI had 10 violations out of 540 units, which fell within Ford Credit's satisfactory guidelines.  ECF No. 109, at 245.  In mid- to late February, PSI sold 12 vehicles to the Paramount Saturn dealership and did not pay over the proceeds to Ford Credit.  Pl's Ex. 26.

On February 27, 2009, Ford Credit performed another audit and determined that PSI had failed to deliver proceeds in the amount of $1,016,420.00.  Pl's Ex. 23.  This amount represented 72 vehicles.  PSI had received the payments, but had failed to deliver the proceeds to Ford Credit.  Franceschini testified that the 72 vehicles "were sold weeks before."  ECF No. 109, at 74.  The sales were then reflected on the February 27 audit, which showed "vehicles [that] had been sold for the prior two or three weeks."  ECF No. 109, at 74.

The other Paramount dealerships had, in the past, loaned money to PSI to help it make audit payments.  But this time, the only transfer from the other Paramount entities was a

$15,000.00 transfer on March 2, 2009 from the Volkswagen dealership.[2]  ECF No. 95-2; Pl's Ex. 66 (bates 4024).

Instead, faced with the immediate requirement to pay over $1 million to Ford Credit, PSI transferred $494,000.00 *out* of its account to the other Paramount dealerships.  PSI made the following transfers to its affiliates between February 27, 2009 and March 6, 2009:

| Transfer Date | Recipient | Amount | Citation |
|---|---|---|---|
| March 2, 2009 | Saturn dealership | $70,000.00 | Pl's Ex. 66 (bates 4031) |
| March 2, 2009 | Saturn dealership | $65,000.00 | Pl's Ex. 66 (bates 4031) |
| March 3, 2009 | Volkswagen dealership | $120,000.00 | Pl's Ex. 66 (bates 4031) |
| March 5, 2009 | Volkswagen dealership | $60,000.00 | Pl's Ex. 66 (bates 4032) |
| March 5, 2009 | Infiniti dealership | $54,000.00 | Pl's Ex. 66 (bates 4032) |
| March 5, 2009 | Volkswagen dealership | $50,000.00 | Pl's Ex. 66 (bates 4032) |
| March 6, 2009 | Volkswagen dealership | $75,000.00 | Pl's Ex. 66 (bates 4032) |

PSI also transferred $126,000.00 to Nicholas Franceschini (Kirk Franceschini's son) and Rene Somoza (Fernando Somoza's wife):

| Date of Check | Date Cleared | Recipient | Amount | Citation |
|---|---|---|---|---|
| February 26, 2009 | March 4, 2009 | Rene Somoza | $30,000.00 | Pl's Ex. 66 (bates 2971) |
| February 26, 2009 | March 4, 2009 | Nicholas Franceschini | $43,000.00 | Pl's Ex. 66 (bates 2987) |
| February 26, 2009 | March 5, 2009 | Nicholas Franceschini | $53,000.00 | Pl's Ex. 66 (bates 3020) |

---

[2] Because the transfer was for only $15,000.00, the Court need not decide whether this amount would offset the amounts that were transferred out of PSI.  As discussion in the Analysis section below, the total of the willful and malicious transfers is over $1.3 million, far in excess of Ford Credit's $917,367.92 claim.  Furthermore, in the context of the pattern of transfers out of PSI, one unidentified transfer into the entity does not mitigate Franceschini's willful and malicious intent.

The checks were dated February 26, 2009, but they did not clear until March 4, 2009 and March 5, 2009.  Pl's Ex. 66 (bates 2971, 2987, 3020).  The payments to Nicholas Franceschini and Rene Somoza were repayments for short-term loans to PSI for working capital.  ECF No. 109, at 114.  Franceschini's son and Somoza's wife eventually repaid PSI, but the repayment was retained by PSI and did not benefit Ford Credit.  ECF No. 109, at 118.  Franceschini admitted that he probably delivered the checks to the owners' family members himself.  "I don't recall.  I assume I would have done it myself, more than likely."  ECF No. 109, at 117.

PSI paid $742,522.91 to vendors.[3]  ECF No. 95-2.  Finally, PSI made two payments—of $193,438.00 and $56,020.00—to MidSouth Bank, its used car floor plan lender.  Pl's Ex. 66 (bates 4032); ECF No. 95-2.

**Summary of Transfers**

| Category of Recipients | Total Amount |
|---|---|
| Affiliated Dealerships | $494,000.00 |
| Owners' Family Members | $126,000.00 |
| Vendors | $742,522.91 |
| MidSouth Bank | $249,458.00 |
| **TOTAL** | **$1,611,980.91** |

Substantially all of the transfers out of PSI—to other dealerships, to family members and to vendors—were transfers of Ford Credit's cash collateral.

Franceschini denied that he was personally involved in making the various transfers, stating that it was ultimately the comptroller's job to balance commitments.  "The checks were written and issued by the comptroller, and it was his job and had been for many years to balance all of our commitments and prioritize our commitments and repay these loans and pay the vendors.  So that would not be something I would do."  ECF No. 109, at 118.

---

[3] The "vendors" include service providers, the county tax collector, and utilities.  The transfers are detailed at Pl's Ex. 66 (bates 2886-3071).

Although Franceschini testified that these transfers occurred in the "ordinary course of business," PSI was no longer engaged in ordinary business.  It was clear that PSI would be unable to deliver the $1,016,420.00 in proceeds due from the February 27, 2009 audit.

In keeping with prior practice, Ford Credit and PSI arranged for an electronic draw from PSI to recover the $1,016,420.00.

On March 3, 2009, Franceschini called Lauer and told him that PSI would not be able to honor the $1,016,420.00 electronic funds transfer.  ECF No. 109, at 49-51.  PSI was in default under the Forbearance Agreement.  Before the bounced electronic funds transfer, PSI had never failed to pay Ford Credit after an audit.  ECF No. 109, at 239.

Later that day, Ford Credit came to the dealership to perform another audit and to take possession of the collateral vehicles.  The audit showed 26 sold/not paid and four vehicles out of trust.  ECF No. 109, at 250.  Franceschini refused to hand over titles to the used vehicles, saying they were not Ford Credit's vehicles.  ECF No. 110, at 35-37.  He also refused to hand over proceeds.  ECF No. 37-38.  Franceschini told Lauer that "he was not going to turn over those proceeds as long as he had checks outstanding, that the checks needed to be covered."  ECF No. 110, at 38.

Lauer then sought a temporary restraining order in state court.  He stated at trial, "It was clear to me at this point he was not paying us and there was no plan for us to get any money, you know, other than if he was able to sell down the road. . . . [G]oing legal to get a TRO as quickly as we did, in my experience was unprecedented."  ECF No. 110, at 42.

On March 6, 2009, the state court issued a TRO.  Pl's Ex. 16; ECF No. 84.  Under the TRO, PSI was restrained from using proceeds generated by the sale of Ford Credit-financed

vehicles that were in PSI's possession or received by PSI after the effective date of the TRO. Pl's Ex. 16, at 1.

PSI complied with the TRO.  ECF No. 109, at 119.  However, it was unable to keep the business going.  Franceschini explained:

> [W]e started out after the TRO optimistic that we'd get back to selling some cars with some rules on how to do it.  But from a practical point of view, you can't just sell a car if you've got to pay for the car before you can deliver the car.  It just didn't work.  I mean, we didn't have the cash to prepay Ford Credit, get all the paperwork done, wait for the funding source to pay us two weeks later.  Within a week or so, it just wasn't working and I let everybody go but the manager as far as the sales staff.

ECF No. 111, at 15-16.

Franceschini remained in charge of the dealerships until they were sold.  The Mazda dealership was not sold until over a year after PSI's default on its debt to Ford Credit.  ECF No. 109, at 190-91.  On at least one occasion, Franceschini discussed potential buyers with Lauer, seeking his advice.  ECF No. 111, at 9-11.

Around April 15, 2009, Franceschini paid about $576,000 to Ford Credit on the sale of the Hyundai store.  ECF No. 109, at 72.  This amount "represented some of the Blue Sky"—the going concern value of the dealership.  ECF No. 109, at 72.

Franceschini kept servicing cars for customers at the Hyundai location until it was sold on April 15, 2009 and until June 2009 at the Mazda location.  ECF No. 111, at 18-19.  His motivation, he said, was to preserve the value of the dealerships' Blue Sky in order to keep potential buyers.  ECF No. 111, at 19.  After the sale of the dealerships and PSI's other assets, PSI still owed Ford Credit $917, 367.92.

### Analysis

In order to prove willful and malicious injury, a creditor must establish both willfulness and malice.  The debtor acted willfully if he deliberately took actions with "either an objective certainty of harm or a subjective motive to cause harm."  *In re Miller*, 156 F.3d 603 (5th Cir. 1998).  Initially, the Court finds that PSI's transfers were willful.  At the time the transfers were may, PSI and Franceschini had objective certainty that the transfer of Ford Credit's cash collateral would harm Ford Credit.  The transfers were intentional.  Despite his protests to the contrary, the Court finds that the transfers were made at Franceschini's direction and finds his testimony to the contrary to lack credibility.

The creditor must also prove malice.  Courts have not collapsed the "malicious" definition into the "willful injury" definition.  "The Fifth Circuit has suggested that the Supreme Court in *Kawaauhau* [*v. Geiger*], 523 U.S. 57 (1998)] has collapsed the malicious definition into the willful injury definition. . . . But, as the Circuit itself notes, the Supreme Court addressed only a willful injury."  *Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65, 71 (Bankr. N.D. Tex. 2000) (citing *In re Caton*, 157 F.3d 1026, 1030 (5th Cir. 1998)).  Therefore, "[i]n addition to willful, the injury must be 'malicious.'  Malicious means 'without just cause or excuse.'"  *Id.* (citing *In re Garner*, 56 F.3d 677, 681 (5th Cir. 1995)).

Violations of security agreements are not *per se* malicious.  *See Am. Honda Fin. Corp. v. Grier (In re Grier)*, 124 B.R. 229, 233 (Bankr. W.D. Tex. 1991) ("Simply because the sale was in violation of the security agreement and was in fact an intentional sale on the part of the debtor should not be enough to trigger a finding of malice.  If this were the case, then nearly any intentional conduct would fall within this exception to discharge, and the term 'malicious' would be effectively read out of the statute.").

However, when a borrower intentionally and unjustifiably withholds proceeds from a secured lender, that violation is willful and malicious. *See Theroux v. HSA Mortgage Co. (In re Theroux)*, 1995 WL 103342, at *4 (5th Cir. Feb. 27, 1995) (holding that a mobile home dealer acted willfully and maliciously in withholding proceeds from secured lender when there was no evidence that he had an objectively reasonable belief that the money was not owed to the secured lender). Malice may be inferred if the debtor acts "in a manner which one knows will place a lender at risk, such as converting property in which the lender holds a security interest." *Id.* at *3.

Franceschini did not act willfully and maliciously until late February 2009. Until that time, Franceschini operated the dealerships with the purpose of continuing the business. He believed that PSI could survive. His belief turned out to be incorrect, but his practices of transferring money to other dealerships, paying vendors, and delivering payments to MidSouth were legitimate attempts to preserve the business.

Once it became clear that the business would fail, however, transfers from PSI's accounts to affiliates, vendors, family members and other creditors were no longer reasonable efforts to preserve the business. Ford Credit had a first-priority lien on PSI's accounts, and transfers to other parties directly injured Ford Credit's interest in the funds. The failure of PSI was undeniable after the electronic transfer bounced on March 3, 2009. The Court concludes that the impending failure was clear even earlier—obviously at least by February 27, 2009, when Ford Credit's audit reported $1,016,420.00 in undelivered proceeds.

After the February 27, 2009 audit, Franceschini knew that the businesses could not be saved. Based on the terms of the Forbearance Agreement and PSI's history of dealings with Ford Credit, Franceschini was aware that Ford Credit would not tolerate non-payment of the

proceeds.  In previous months, when PSI did not have the funds to pay the proceeds due to Ford Credit, Franceschini had caused the other Paramount dealerships to make short-term loans to PSI.  This time, Franceschini did not transfer any funds from the other dealerships to PSI. Instead, he transferred $494,000.00 *out* of PSI into the other dealerships.  PSI was certain to fail if it did not pay Ford Credit.  Franceschini's transfer of money out of PSI demonstrates his intent to grab assets before Ford Credit took control—as it did on March 6, 2009.

One day prior to the February 27, 2009 audit, checks for $126,000.00 were issued to family members.  The Court concludes that the audit showing a $1.0 million deficit did not come as a surprise.  The February 26, 2009 checks were written with knowledge that the audit would show the substantial out-of-trust condition, and cause the failure of the business.

In light of the near-certain failure of PSI, the transfers of $126,000.00 to Nicholas Franceschini and Rene Somoza were also made in reckless disregard of Ford Credit's rights. Even if Franceschini somwhow did not know of the impending failure on February 26, 2009, the checks did not clear until March 4, 2009 and March 5, 2009, well after the audit.  The Court finds that the failure to stop payment on these checks to family members—days after it had become clear that Ford Credit's collateral needed to be protected—was willful and malicious. Finally the transfer of $742,522.91 to vendors was in reckless disregard of Ford Credit's first-priority lien on the funds.

The parties dispute whether a transfer made to MidSouth Bank in the amount of $249,458.00 was also done with willful and malicious intent.  MidSouth held a subordinated line of credit secured by PSI's used vehicle inventory, and Franceshini alleges that payment to MidSouth was justified; because the MidSouth line of credit was subordinated, Ford Credit disagrees.

Because the transfers to PSI's affiliates ($494,000), the owners' family members ($126,000), and vendors ($742,522.91) total $1,362,522.91—$445,154.99 more than Ford Credit's claim against Franceschini—the issue of whether the transfer of the additional $249,458.00 to MidSouth was also willful and malicious is moot. If not for the transfers to affiliates, family members, and vendors, Ford Credit would have been paid in full.

Franceschini argues, however, that he had "just cause or excuse" for making the transfers, and that the transfers therefore were not malicious.

First, Franceschini argues that Ford Credit acquiesced in his business practices. A reasonably held belief that the creditor has acquiesced in a business practice may qualify as "just cause or excuse" for engaging in that practice. *See Grier*, 124 B.R. at 233 ("There was . . . a reasonably held belief that AHFC had acquiesced in Grier's business practice, a circumstances which this court finds qualifies as a 'just cause or excuse' for his having failed to remit the proceeds to AHFC as the Security Agreement technically required."). The court in *Grier* noted in dicta that continued enforcement of a floor plan financier's rights would prevent modification of agreements: "Floor plan financiers can protect themselves by conducting routine audits on their security and by insisting that the terms of the agreements not be compromised or modified by course of dealings (or similar conduct). Diligent, vigilant creditors will continue to be protected." *Id.* at 234.

Franceschini's actions were not justified by Ford Credit's acquiescence. Ford Credit was a diligent, vigilant creditor: it regularly audited PSI and continued to insist on the protection of its rights under the Agreements. Although PSI regularly delivered proceeds later than was required under the Agreements, Ford Credit never tolerated actual nonpayment and continued to demand timely payment. After all audits before the February 27, 2009 audit, PSI had

immediately made the required audit payment to Ford Credit.  Ford Credit did not acquiesce to PSI's refusal to remit proceeds to Ford Credit.  Moreover, as Ford Credit learned of compliance problems, it increased the frequency of its audits, and sent communications to PSI demanding better compliance.  There was no acquiescence by Ford Credit.

Second, Franceschini argues that the payments to vendors were justified because they helped to preserve the value of PSI as an ongoing business.   However, after February 27, 2009, it was apparent that the dealerships could not continue selling cars.  Franceschini cannot reasonably have thought that paying off the vendors would enable PSI to remain in business. PSI could not remain in business if it defaulted on its obligations to Ford Credit.  Paying the vendors without paying Ford Credit does not demonstrate an intent to preserve the dealerships as ongoing businesses.  Franceschini was not justified in paying vendors from funds on which Ford Credit had a first-priority lien.

The payments to the owners' family members are also unjustified.   Although Franceschini said that the transfers to Nicholas Franceschini and Rene Somoza were repayments of loans that allowed the dealerships to continue operating, he had no just cause or excuse for repaying those loans from Ford Credit's proceeds after he knew the businesses would fail.  Ford Credit has a superior right to the funds, and paying other creditors first was an intentional and malicious injury of Ford Credit.  Franceschini testified that the funds transferred to Nicholas Franceschini and Rene Somoza were eventually paid back to PSI, but the funds were never paid to Ford Credit.  Ford Credit had a security interest in the money, and it should not have been diverted.

Finally, Franceschini argues that the transfers harmed Ford Credit only to the extent that they made Ford Credit's collateral position worse than it was before February 27, 2009.  Ford

Credit already had a "built-in loss" before February 27, 2009, he asserts, and the transfers should be excepted from discharge only to the extent that they increased Ford Credit's loss.

In theory, Franceschini is correct: his actions constituted willful and malicious injury only to the extent that they caused Ford Credit to lose more money than it otherwise would have lost. The Court concludes, however, that Ford Credit was oversecured as of the February 27, 2009 audit. Because Ford Credit had a blanket lien on various PSI assets, including vehicles and accounts, an assessment of its collateral position must take into account not only the value of the dealerships' new-car inventory, but also the value of used cars, parts, and Blue Sky.

According to Ford Credit's internal records, Ford Credit's collateral position as of December 31, 2008 was positive. As of December 31, 2008, PSI had $9,598,529.00 in new vehicles, $1,362,991.00 in used vehicles, and $1,390,537.00 in contracts in transit. Pl's Ex. 46, at 5 (bates KF003871) & 14 (bates KF003880). Ford Credit's vehicle collateral was worth a total of $12,352,057.00. Ford Credit's other collateral, as of December 31, 2008, was worth $1,936,778.00, without taking into account the value of PSI's equipment, furniture, and fixtures. *See* ECF No. 98, at 6 n.9. The other collateral consisted of: cash ($396,183.00), other accounts receivables ($919,282.00), and parts inventory ($621,313.00). Pl's Ex. 46, at 5 (bates KF003871) and 14 (bates KF003882). Ford's collateral was therefore worth $14,288,835.00. As of December 31, 2008, PSI owed Ford Credit $13,039,519.00. Pl's Ex. 46, at 5 (bates KF003871). According to the December 31, 2008 report, Ford Credit had a positive collateral position of $1,249,316.00.

Franceschini provided evidence that Ford Credit's collateral position as of June 7, 2007 was negative. An internal memorandum from a financial analyst to several Ford Credit

managers, including Kurt Lauer, indicates a net new-vehicle deficit of $764,762.00.  Def's Ex. F, at 19, ECF No. 52-1, at 34.

Ford Credit correctly argues that the deficit of $764,762.00 fails to take into account the value of Ford Credit's other collateral, including retail installment contracts, used cars, parts, and the dealerships' Blue Sky.  ECF No. 100, at 9.  After March 6, 2009, Ford collected some proceeds from the dealerships, and the Hyundai dealership, used cars, and parts were sold, for a total amount of $1,039,632.08 that was applied to the floor plan debt.[4]  *See* Pl's Ex. 55, at 38; Pl's Ex. 74; ECF No. 110, at 70-73.  This amount, combined with the $1,016,420.00 in sales out of trust shown on the February 27, 2009 audit, indicates that if not for the sales out of trust, Ford Credit's collateral position would ultimately have been positive.

Ford Credit's evidence is more recent, and in light of the amounts collected from the sale of the assets, Ford Credit's estimate of its collateral position is more reliable.  There was no built-in loss.

Franceschini was a guarantor and thus personally liable under Agreements.  ECF No. 109, at 181-82.  Because he caused PSI's transfers, he personally acted willfully and maliciously. Franceschini's personal debt to Ford Credit is thus nondischargeable.  Franceschini denied personal involvement in the transfers on a day-to-day basis.  ECF No. 109, at 141.  The totality of the evidence shows, however, that Franceschini was in charge of the dealerships and was responsible for the transfers.  Franceschini, as an owner of the dealerships, was aware of the importance of preserving Ford Credit's collateral position.  He had extensive experience with Ford Credit's audits and demands for payment.  Franceschini signed the Forbearance Agreement and was aware of its conditions.  He knew, or should have known, the conditions of the

---

[4] The sales proceeds from the Mazda dealership were applied to the working capital loan, which is not at issue in this adversary proceeding.

Subordination Agreements.  He knew that failure to pay Ford Credit after the audit would result in the demise of the dealerships, and he had the authority to ensure that Ford Credit's collateral was protected.

Franceschini is highly experienced in the car dealership business, and it is not plausible that he was not involved in the dealerships' activities during the critical time period between February 27, 2009 and March 6, 2009.  He had experience with the Infiniti dealership's floor plan lender when that dealership failed to deliver proceeds, and he was aware of the seriousness of the issue.

Ford Credit's legal fees for enforcing its rights are also excepted from discharge.  Ford Credit is contractually entitled to legal fees incurred to enforce its rights under the Agreements and to protect its collateral.  Pl's Ex. 1, at 2; Pl's Ex. 2, at 3.  Ford Credit's legal fees are nondischargeable if they also arise from Franceschini's willful and malicious conduct.  *Cf. Fire Safe Protection Servs., LP v. Ayesh*, 2011 WL 4631865, at *6 (Bankr. S.D. Tex. Sept. 21, 2011) (holding that legal fees awarded in a state-court breach of contract lawsuit were nondischargeable under § 523(a)(2)(A) because the breach of contract claim was an "obvious outgrowth" of the defendant's false representations) (quoting *Miller v. Lewis*, 391 B.R. 380, 382 (E.D. Tex. 2008), *aff'd* 307 F. App'x 785 (5th Cir. 2008)).

Although a breach of contract is not automatically a willful and malicious injury, Franceschini's violation of the Agreements was—as discussed above—willful and malicious.  This adversary proceeding was an "obvious outgrowth" of Franceschini's willful and malicious breach; if not for Franceschini's refusal to turn over Ford Credit's proceeds, the legal fees would not have been incurred.  The "tort" nature of a § 523(a)(6) action does not affect this outcome.  A willful and malicious injury may be committed through the intentional breach of a contract.  *See*

*Theroux*, 1995 WL 103342 at *4 (holding that debtor committed willful and malicious injury when he intentionally and unreasonably violated a security agreement by withholding proceeds). In such cases, the damages incurred due to the willful breach, including legal fees to enforce the contract rights, are an obvious outgrowth of the willful and malicious injury.

The Court reserved the issue of the amount of legal fees until after a decision on the merits. Franceschini argues that Ford Credit's fees for the motion to dismiss and the motion for summary judgment should not be excepted from discharge. At a later hearing, the Court will determine whether Ford Credit's legal fees were reasonable.

**Conclusion**

Franceschini's debt to Ford Credit will be excepted from discharge  Within 21 days, Ford Credit and Franceschini shall either (i) file a stipulation as to the amount of Ford Credit's reasonable legal fees, or (ii) contact the Court's Case Manager and arrange a date for an evidentiary hearing on the amount of Ford Credit's reasonable legal fees. After the legal fees are determined, a judgment will be issued.

SIGNED <u>January 12, 2012.</u>

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE